# FINAL RESULTS OF REDETERMINATION
# PURSUANT TO REMAND

*SeAH Steel Corporation and Kurt Orban Partners, LLC v. United States (Defendant) and Allied Tube Conduit et al. (Defendants-Intervenors)*
Court No. 11-00226
(Ct. Int'l Trade October 13, 2011)

## I.  SUMMARY

This remand determination, issued in accordance with the October 13, 2011, order of the

U.S. Court of International Trade ("the Court") in *SeAH Steel Corporation and Kurt Orban*

*Partners, LLC v. United States (Defendant) and Allied Tube Conduit et al. (Defendants-*

*Intervenors)*, Court No. 11-00226 (Ct. Int'l Trade October 13, 2011) ("Remand Order"),

concerns the determination of the Department of Commerce ("the Department") on entries made

by SeAH Steel Corporation ("SeAH") in the administrative review of the antidumping duty order

on circular welded non-alloy steel pipe from the Republic of Korea for the period November 1,

2008, through October 31, 2009. *See Circular Welded Non-Alloy Steel Pipe From the Republic*

*of Korea:  Final Results of the Antidumping Duty Administrative Review*, 76 FR 36089 (June 21,

2011) ("*Circular Pipe Final*").

Pursuant to the Court's Remand Order, the Department has considered further the

application of its zeroing methodology to SeAH consistent with the recent decision of the U.S.

Court of Appeals for the Federal Circuit ("Federal Circuit" or "CAFC") in *JTEKT Corp. v.*

*United States*, 642 F.3d 1378 (Fed. Cir. 2011) ("*JTEKT*").  At the same time, the Court also

granted the Department's request for a voluntary remand to reconsider its cost-recovery analysis

in light of *SeAH Steel Corp. v. United States*, 764 F. Supp. 2d 1322 (CIT 2011) ("*SeAH II*").  As

discussed further below, the Department has re-evaluated the use of both the zeroing

methodology and cost-recovery analysis employed in the *Circular Pipe Final*.  Concerning the

Department's zeroing methodology, for the reasons set forth below, the Department has,

consistent with *JTEKT*, provided further explanation with regard to its zeroing methodology.

Concerning the Department's cost-recovery analysis, as explained below, the Department has

altered its cost-recovery analysis to comply with the decision in *SeAH II*. As a result of the

Department's redetermination, SeAH's dumping margin decreased from 4.99 percent to 3.87

percent.

## II.     BACKGROUND

On June 21, 2011, the Department issued its final results in the administrative review of

the antidumping duty order on circular welded non-alloy steel pipe from the Republic of Korea

covering the period from November 1, 2008, through October 31, 2009. *See Circular Pipe*

*Final*. On October 13, 2011, the Court remanded to the Department certain elements of its final

results. *See* Remand Order. The matters at issue for this remand redetermination are 1) the

Department's use of its zeroing methodology, and 2) the Department's cost-recovery analysis.

1.     The Department's Zeroing Methodology

During the administrative review, SeAH argued that the Department unlawfully zeroed

negative dumping margins when calculating SeAH's weighted-average dumping margin. SeAH

contended that the Department's interpretation of section 771(35) of the Tariff Act of 1930, as

amended ("the Act"), as permitting zeroing in administrative reviews but not in investigations

cannot be sustained as reasonable under *Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.*,

467 U.S. 837 (1984) ("*Chevron*"). SeAH further asserted that the Federal Circuit has rejected

the claim that section 771(35) of the Act has a different meaning in investigations and reviews.

*See Corus Staal BV v. Department of Commerce*, 395 F.3d 1343, 1347 (Fed. Cir. 2005) ("*Corus*

*I*"). In SeAH's view, the U.S. Supreme Court's decision in *Clark v. Martinez*, 543 U.S. 371

(2005) ("*Clark*") is also on point.  There the Court found that giving the same words a different

meaning would be to invent a statute rather than interpret one.

2.      The Department's Cost-Recovery Analysis

        During the administrative review, SeAH argued that, because the Department did not

apply the requisite cost-recovery analysis, the Department excluded below-cost, home-market

sales from its analysis regardless of whether such sales were made above the period of review

("POR"), weighted-average cost of production ("COP").  Specifically, SeAH argued that, while

sections 773(b)(1)(A) and (B) of the Act permit the Department to disregard sales which "have

been made within an extended period of time in substantial quantities" which "were not at prices

which permit the recovery of all costs within a reasonable period of time," section 773(b)(2)(D)

of the Act requires that below-cost prices that are above the POR weighted-average COP "be

considered to provide for recovery of costs within a reasonable period of time."  In support of its

argument, SeAH cited *SeAH Steel Corp. v. United States*, 704 F. Supp. 2d 1353, n. 18 (CIT

2010) ("*SeAH I*") in which the Court stated that section 773(b)(2)(D) of the Act prevents the

Department from comparing below-cost sales prices to a weighted-average per-unit COP for a

time period other than the POR.  Accordingly, SeAH concluded that the Department should

apply the cost-recovery analysis to sales which were excluded as below cost and, if such sales

were above the POR, weighted-average, per-unit COP, then to include them in the dumping

margin calculation.

        In the *Circular Pipe Final*, the Department conducted its cost-recovery analysis by

comparing SeAH's below-cost, home-market sales prices to the product-specific, indexed, POR,

weighted-average, per-unit COP.  *See Circular Pipe Final* and accompanying Issues and

Decision Memorandum at Comment 2.  To calculate the product-specific, indexed, POR,

weighted-average, COP, the Department restated SeAH's reported quarterly COPs on a year-end

basis using an indexation methodology, calculated a weighted-average COP for the POR, and

then restated the POR, weighted-average COP to each quarter using the same indexation

methodology. *Id.* Subsequent to the *Circular Pipe Final*, the Court's decision in *SeAH I* became

final and conclusive. *See SeAH II*, 764 F. Supp. 2d at 1333 - 1335 (ruling "the language of the

cost recovery statute unambiguously requires Commerce to use one single benchmark value –

the weighted average per unit COP for the POR – in the cost recovery analysis" and directing the

Department to conduct its cost-recovery analysis using the unindexed, weighted average, POR

COP). For the purposes of this remand redetermination, we have re-evaluated the cost-recovery

analysis employed in the *Circular Pipe Final* in light of the Court's decision in *SeAH II*.

## III.   ANALYSIS

1.   The Department's Zeroing Methodology

Upon multiple occasions, the Federal Circuit squarely addressed the reasonableness of

the Department's zeroing methodology in administrative reviews and unequivocally held that the

Department reasonably interpreted the relevant statutory provision as permitting zeroing. *See,*

*e.g., Koyo Seiko Co. v. United States*, 551 F.3d 1286, 1290-91 (Fed. Cir. 2008); *NSK Ltd. v.*

*United States*, 510 F.3d 1375, 1379-80 (Fed. Cir. 2007) ("*NSK*"); *Corus Staal BV v. United*

*States*, 502 F.3d 1370, 1375 (Fed. Cir. 2007) ("*Corus II*"); *Corus I*; *Timken Co. v. United States,*

354 F.3d 1334 (Fed. Cir. 2004) ("*Timken*"). Notwithstanding this precedential bulwark, the

Department accords with the Court's Remand Order and provides further explanation concerning

its interpretation of the statute to allow zeroing with respect to average-to-transaction

comparisons in the underlying administrative review, while also allowing the Department not to

4

apply zeroing with respect to average-to-average comparisons in antidumping duty investigations.

### A.    *Background Behind The Perceived Inconsistency*

Section 771(35)(A) of the Act, which authorizes the Department to apply zeroing in antidumping duty proceedings, states that "{t}he term 'dumping margin' means the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." The Federal Circuit repeatedly found section 771(35)(A) of the Act ambiguous as to whether the statute *requires* zeroing, stating that "Congress's use of the word 'exceeds' {in section 771(35) of the Act} does not unambiguously require that dumping margins be positive numbers." *Timken*, 354 F.3d at 1342; *see also U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1361 (Fed. Cir. 2010) ("*U.S. Steel Corp.*") ("{T}he statute is silent as to what to do when the 'amount' calculated by Commerce pursuant to {section 771(35)(A) of the Act} is negative."). The Department has interpreted section 771(35) of the Act to permit zeroing in both administrative reviews and antidumping duty investigations. *See, e.g., Timken*, 354 F.3d at 1340 (in a challenge to the Department's use of zeroing in administrative reviews, the United States argued that "the plain meaning of the antidumping statute calls for Commerce to zero negative margin transactions, and that the legislative history confirms this reading."); *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 FR 77722 (December 27, 2006) ("*Final Modification For Investigations*") (wherein the Department modified its prior practice of zeroing in investigations using average-to-average comparisons). The Federal Circuit upheld this interpretation separately in the context of both antidumping duty investigations and administrative reviews as a reasonable resolution of statutory ambiguity concerning the treatment of comparison results that

show normal value does not exceed export price or constructed export price. *See, e.g., SKF USA Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011) ("*SKF*") (upholding use of zeroing in an administrative review for which final results issued after *Final Modification For Investigations* took effect); *Corus I*, 395 F.3d at 1347-49 (upholding use of zeroing in an investigation); *Timken* (upholding use of zeroing in an administrative review).

In 2005, a panel of the World Trade Organization ("WTO") Dispute Settlement Body ("Panel") found that the United States did not act consistently with its obligations under Article 2.4.2 of the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994 when it employed the zeroing methodology in average-to-average comparisons[1] in certain challenged antidumping duty investigations. *See* Panel Report, *United States – Laws, Regulations and Methodology for Calculating Dumping Margins (Zeroing)*, WT/DS294/R (Oct. 31, 2005) ("*EC-Zeroing Panel*"). In light of the adverse WTO Dispute Settlement Body decision and the ambiguity that the Federal Circuit found inherent in the statutory text, the Department abandoned its prior litigation position – that no difference between antidumping duty investigations and administrative reviews exists for purposes of using zeroing in antidumping proceedings – and departed from its longstanding and consistent practice by ceasing the use of zeroing in the limited context of average-to-average comparisons in antidumping duty investigations. *See generally Final Modification For Investigations.* The Department did not change its practice of zeroing in other types of comparisons, including average-to-transaction comparisons in administrative reviews.[2] *See id.*, 71 FR at 77724.

---

[1] An average-to-average comparison involves a comparison of "the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise." Section 777A(d)(1)(A)(i) of the Act.

[2] An average-to-transaction comparison requires the Department to compare "export price{} (or constructed export price{}) of individual transactions to the weighted average price of sales of the foreign like product." Section 777A(d)(2) of the Act.

The Federal Circuit subsequently upheld the Department's decision to cease zeroing in average-to-average comparisons in antidumping duty investigations while recognizing that the Department limited its change in practice to certain investigations and continued to use zeroing when making average-to-transaction comparisons in administrative reviews. *See U.S. Steel Corp.*, 621 F.3d. at 1355, n.2, 1362-63. In upholding the Department's decision to cease zeroing in average-to-average comparisons in antidumping duty investigations, the Federal Circuit accepted that the Department likely would have different zeroing practices between average-to-average and other types of comparisons in antidumping duty investigations. *Id.* at 1363 (stating that Department indicated an intention to use zeroing in average-to-transaction comparisons in investigations to address concerns about masked dumping). The Federal Circuit's reasoning in upholding the Department's decision relied in part on differences between various types of comparisons in antidumping duty investigations and the Department's limited decision to cease zeroing only with respect to one comparison type. *Id.* at 1361-63. The Federal Circuit acknowledged that section 777A(d) of the Act permits different types of comparisons in antidumping duty investigations, allowing the Department to make average-to-transaction comparisons where certain patterns of significant price differences exist. *See id.* at 1362 (quoting sections 777A(d)(1)(A) and (B) of the Act, which enumerate various comparison methodologies that Department may use in investigations); *see also* section 777A(d)(1)(B) of the Act. The Federal Circuit also expressly recognized that the Department intended to continue to address targeted or masked dumping through continuing its use of average-to-transaction comparisons and zeroing. *See U.S. Steel Corp.*, 621 F.3d at 1363. In summing up its understanding of the relationship between zeroing and the various comparison methodologies that the Department may use in antidumping duty investigations, the Federal Circuit acceded to

the possibility of disparate, yet equally reasonable interpretations of section 771(35) of the Act,

stating that "{b}y enacting legislation that specifically addresses such situations, Congress may

just as likely have been signaling to Commerce that it need not continue its zeroing methodology

in situations where such significant price differences among the export prices do *not* exist." *Id.*

(emphasis added).

Therefore, to the extent that the Department interprets section 771(35)(A) of the Act

differently for antidumping duty investigations using average-to-average comparisons than for

investigations using other comparison methodologies and administrative reviews using average-

to-transaction comparisons, the Department did not create an inconsistency in this administrative

review, but rather adhered to its position adopted in *Final Modification For Investigations*.

**B.      The Department Reasonably Interpreted Section 771(35) of the Act**

The Department's interpretation of section 771(35) of the Act reasonably resolves the

ambiguity inherent in the statutory text for multiple reasons.  First, the Department has, with one

limited exception, maintained a long-standing, judicially-affirmed interpretation of section

771(35) of the Act in which the Department does not consider a sale to the United States as

dumped if normal value does not exceed export price.  Pursuant to this interpretation, the

Department gives such sale a dumping margin of zero, which reflects that no dumping has

occurred, when calculating the aggregate weighted-average dumping margin.  Second, the

limited exception to this interpretation does not amount to an arbitrary departure from

established practice, as the Executive Branch adopted and implemented the approach in response

to a specific international obligation pursuant to the procedures established by the Uruguay

Round Agreements Act for such changes in practice with full notice, comment, consultation with

the Legislative Branch, and explanation.  Third, the Department's interpretation reasonably

resolves the ambiguity in section 771(35) of the Act in a way that accounts for the inherent

differences between the result of an average-to-average comparison, on the one hand, and the

result of an average-to-transaction comparison, on the other.

### 1. The Department Used a Reasonable and Judicially-Affirmed Interpretation of Section 771(35) of the Act

For decades, the Department and various federal courts considered the use of zeroing a

reasonable tool in calculating dumping margins. *See, e.g., Timken*, 354 F.3d at 1341-45; *PAM*

*S.p.A. v. U.S. Dept. of Commerce*, 265 F. Supp. 2d 1362, 1370 (CIT 2003) ("*PAM*")

("Commerce's zeroing methodology in its calculation of dumping margins is grounded in long-

standing practice."); *Bowe Passat Reinigungs-Und Waschereitechnik GmbH v. United States*,

926 F. Supp. 1138, 1149-50 (CIT 1996) ("*Bowe Passat*"); *Serampore Indus. Pvt. Ltd. v. U.S.*

*Dep't of Commerce*, 675 F. Supp. 1354, 1360-61 (CIT 1987) ("*Serampore*").  During that time,

the courts repeatedly held that the statute does not speak directly to the issue of zeroing. *See*

*PAM,* 265 F. Supp. 2d at 1371 ("{The} gap or ambiguity in the statute requires the application of

the *Chevron* step-two analysis and compels this court to inquire whether Commerce's

methodology of zeroing in calculating dumping margins is a reasonable interpretation of the

statute."); *Bowe Passat*, 926 F. Supp. at 1150 ("The statute is silent on the question of zeroing

negative margins."); *Serampore*, 675 F. Supp. at 1360 ("A plain reading of the statute discloses

no provision for Commerce to offset sales made at {less than fair value} with sales made at fair

value. . . .  Commerce may treat sales to the United States market made at or above prices

charged in the exporter's home market as having a zero percent dumping margin.").  In view of

the statutory ambiguity, the courts consistently upheld as reasonable the Department's

interpretation of the statute to permit the use of zeroing. *See, e.g., Timken*, 354 F.3d at 1341-45;

*PAM*, 265 F. Supp. 2d at 1370; *Bowe Passat*, 926 F. Supp. at 1149-50; *Serampore*, 675 F. Supp.

at 1360-61.  In so doing, the courts relied upon the rationale offered by the Department for the

continued use of zeroing, *i.e.*, to address the potential for foreign companies to undermine the

antidumping laws by masking dumped sales with higher priced sales:  "Commerce has

interpreted the statute in such a way as to prevent a foreign producer from masking its dumping

with more profitable sales.  Commerce's interpretation is reasonable and is in accordance with

law." *Serampore,* 675 F. Supp. at 1361 (citing *Certain Welded Carbon Steel Standard Pipe and

Tube From India; Final Determination of Sales at Less Than Fair Value*, 51 FR 9089, 9092

(March 17, 1986)); *see also Timken*, 354 F.3d at 1343; *PAM*, 265 F. Supp. 2d at 1371.

> 2.  *The Executive Branch's Limited Implementation of an Adverse Finding of the WTO
>     Dispute Settlement Body Results in a Reasonable Interpretation of Section 771(35) of the
>     Act*

The WTO Dispute Settlement Body limited its initial adverse report to the Department's

use of zeroing in average-to-average comparisons in antidumping duty investigations.  *See

generally EC-Zeroing Panel*.  The Executive Branch determined to implement this report

pursuant to the authority provided in section 123 of the Uruguay Round Agreements Act (19

U.S.C. § 3533(f), (g)) ("Section 123").  *See generally Final Modification For Investigations*.

Notably, with respect to the use of zeroing, the Panel found that the United States acted

inconsistently with its WTO obligations only in the context of average-to-average comparisons

in antidumping duty investigations.  The Panel did not speak to the use of zeroing by the United

States in any other context.  In fact, the Panel rejected the European Communities' arguments

that the use of zeroing in administrative reviews did not comport with the WTO Agreements.

*See, e.g.*, *EC-Zeroing Panel,* at para. 7.284 and 7.291.  Without an affirmative inconsistency

finding by the Panel, the Department did not propose to alter its zeroing practice in other

contexts, such as administrative reviews.  As the Federal Circuit recently held, the Department

reasonably may decline, when implementing an adverse WTO report, to take any action beyond

that necessary for compliance. *See Thyssenkrupp Acciai Speciali Terni S.p.A. v. United States*,

603 F.3d 928, 934 (Fed. Cir. 2010) ("*Thyssenkrupp*").

The WTO Dispute Settlement Body's finding on the use of zeroing in average-to-average

comparisons in antidumping duty investigations, and the Department's *Final Modification For*

*Investigations* to implement that limited finding, do not disturb the reasoning offered by the

Department and affirmed by the Federal Circuit in several prior, precedential opinions upholding

the use of zeroing in average-to-transaction comparisons in administrative reviews as a

reasonable interpretation of section 771(35) of the Act. *See, e.g., SKF USA, Inc. v. United*

*States*, 537 F.3d 1373, 1382 (Fed. Cir. 2008); *NSK*, 510 F.3d at 1379-1380; *Corus II*, 502 F.3d at

1372-1375; *Timken*, 354 F.3d at 1343. That the Department altered its interpretation of the

statute in one limited context to implement a similarly limited finding supports the conclusion

that the Court should affirm the Department's alternative interpretation of an ambiguous

statutory provision in that limited context as consistent with the *Charming Betsy* doctrine.[3]  Even

where the Department maintains a separate interpretation of the statute to permit the use of

zeroing in certain dumping margin calculations, the *Charming Betsy* doctrine bolsters the ability

of the Department to apply an alternative interpretation of the statute in the narrow context of

average-to-average comparisons in antidumping duty investigations so that the United States

may comply with its international obligations. Neither Section 123 nor the *Charming Betsy*

doctrine require the Department to modify its interpretation of section 771(35) of the Act for all

---

[3] According to *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804) ("*Charming Betsy*"), "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains, and consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country." The principle emanating from the quoted passage, known as the *Charming Betsy* doctrine, supports the reasonableness of the Department's interpretation of the statute in the limited context of average-to-average comparisons in antidumping duty investigations because the Department's interpretation of the domestic law accords with international obligations as understood in this country.

scenarios when a more limited modification will address the adverse WTO finding that the

Executive Branch has determined to implement. Furthermore, the wisdom of the Department's

legitimate policy choices is not subject to judicial review. *Suramerica de Aleaciones Laminadas,*

*C.A. v. United States*, 966 F.2d 660, 665 (Fed. Cir. 1992). These reasons alone sufficiently

justify and explain why the Department reasonably interpreted section 771(35) of the Act

differently in average-to-average comparisons in antidumping duty investigations relative to all

other contexts.

3. *The Department's Interpretation Reasonably Accounts for Inherent Differences Between The Results of Distinct Comparison Methodologies*

Additional justifications exist that demonstrate the reasonableness of the Department's

distinct interpretations of section 771(35) of the Act. As a result of the Department's *Final*

*Modification For Investigations*, the Department currently interprets section 771(35) of the Act

depending upon the type of comparison methodology applied in the particular proceeding. The

Department posits that, among other effects, its interpretation reasonably accounts for the

inherent differences between the result of an average-to-average comparison, on the one hand,

and the result of an average-to-transaction comparison, on the other.

The use of the verb "exceeds" in section 771(35)(A) of the Act allows the Department to

reasonably interpret the term in the context of the average-to-average comparisons made in

antidumping duty investigations to permit negative comparison results to offset or reduce

positive comparison results when calculating "aggregate dumping margins" within the meaning

of section 771(35)(B) of the Act.[4] When using an average-to-average comparison methodology,

the Department usually divides the export transactions into groups, by model and level of trade

---

[4] Section 771(35)(B) of the Act defines a weighted-average dumping margin as "the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer."

(averaging groups), and compares an average export price or constructed export price of transactions within one averaging group to an average normal value for the comparable model of the foreign like product at the same or most similar level of trade. In calculating the average export price or constructed export price, the Department averages together all prices, both high and low, for each averaging group. The Department then compares the average export price or constructed export price for the averaging group with the average normal value for the comparable merchandise. This comparison yields an average amount of dumping for the particular averaging group because the high and low prices within the group have been averaged together prior to the comparison. Importantly, under this comparison methodology, the Department does not calculate the extent to which an exporter or producer dumped a particular sale into the United States because the Department does not determine dumping on the basis of individual U.S. prices, but rather makes the determination "on average" for the averaging group within which lower prices are offset by higher prices. The Department then aggregates the results from each of the averaging groups to determine the aggregate dumping margin for a specific producer or exporter. At this aggregation stage, negative averaging group comparison results offset positive averaging group comparison results. This approach maintains consistency with the Department's average-to-average comparison methodology, which permits export prices above normal value to offset export prices below normal value within each individual averaging group. Thus, by permitting offsets in the aggregation stage, the Department determines an "on average" aggregate amount of dumping for the numerator of the weighted-average dumping margin ratio consistent with the manner in which the comparison results being aggregated were determined.

13

In contrast, when applying an average-to-transaction comparison methodology, as the Department did in this administrative review, the Department determines dumping on the basis of individual U.S. sales prices. Under the average-to-transaction comparison methodology, the Department compares the export price or constructed export price for a particular U.S. transaction with the average normal value for the comparable model of foreign like product. This comparison methodology yields results specific to the selected individual export transactions. The result of such a comparison evinces the amount, if any, by which the exporter or producer sold the merchandise at an export price less than its normal value. The Department then aggregates the results of these comparisons – *i.e.*, the amount of dumping found for each individual sale – to calculate the weighted-average dumping margin for the POR. To the extent the average normal value does not exceed the individual export price or constructed export price of a particular U.S. sale, the Department does not calculate a dumping margin for that sale or include an amount of dumping for that sale in its aggregation of transaction-specific dumping margins.[5] Thus, when the Department focuses on transaction-specific comparisons, as it did in this administrative review, the Department reasonably interprets the word "exceeds" in section 771(35)(A) of the Act as including only those comparisons that yield positive amounts of dumping. Consequently, in transaction-specific comparisons, the Department reasonably does not permit negative amounts of dumping to offset or reduce positive amounts of dumping when determining the "aggregate dumping margin" within the meaning of section 771(35)(B) of the Act.

---

[5] The Department does account, however, for the sale in its weighted-average dumping margin calculation. The value of any non-dumped sale is included in the denominator of the weighted-average dumping margin while no dumping amount for non-dumped transactions is included in the numerator. Therefore, any non-dumped transactions result in a lower weighted-average dumping margin.

Put simply, following the Department's *Final Modification For Investigations*, the Department has interpreted the application of average-to-average comparisons to contemplate a dumping analysis that examines the overall pricing behavior of an exporter or producer with respect to the subject merchandise, whereas under the average-to-transaction comparison methodology the Department continues to undertake a dumping analysis that examines the pricing behavior of an exporter or producer with respect to individual export transactions. The offsetting approach described in the average-to-average comparison methodology allows for a reasonable examination of overall pricing behavior. However, the need to account for overall pricing behavior does not arise when the Department examines an exporter's or producer's sales on an individual export transaction basis.

In sum, on the issue of how to treat negative amounts of dumping in the calculation of the weighted-average dumping margin pursuant to section 771(35)(B) of the Act, for the reasons explained, the Department reasonably may accord dissimilar treatment to negative amounts of dumping depending on whether the result in question flows from an average-to-average comparison or an average-to-transaction comparison. Accordingly, the Department's interpretation of section 771(35) of the Act to permit zeroing in average-to-transaction comparisons, as in the underlying administrative review, and to not permit zeroing in average-to-average comparisons, as the Department does in antidumping duty investigations, reasonably accounts for the differences inherent in distinct comparison methodologies.

2.    The Department's Cost-Recovery Analysis

As discussed above, in the *Circular Pipe Final*, the Department conducted its cost-recovery analysis by comparing SeAH's below-cost, home-market sales prices to a product-specific, indexed, POR, weighted-average COP. *See Circular Pipe Final* and accompanying

Issues and Decision Memorandum at Comment 2. To comply with the Court's ruling in *SeAH II*, the Department has revised its cost-recovery analysis in cases such as this where the Department determines that a quarterly costing approach is appropriate. *See Certain Welded Carbon Steel Pipe and Tube From Turkey; Notice of Preliminary Results of Antidumping Duty Administrative Review*, 76 FR 33204, 33208 (June 8, 2011). The Department has applied its revised cost-recovery analysis for the purposes of this remand redetermination. The Department's revised cost-recovery analysis not only complies with the statutory mandate at section 773(b)(2)(D) of the Act to use the POR, weighted-average cost, but also conforms to the Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1., at 832 (1994)("SAA"), which clarifies that "the determination of cost recovery is based on an analysis of actual weighted-average prices and cost during the period of investigation or review."

To apply the Department's revised cost-recovery analysis, we have identified those sales which have prices below the POR, indexed, weighted-average COPs in the *Circular Pipe Final*. For those products which have below-cost sales made in substantial quantities, we calculated product-specific, weighted-average, POR prices for the below-cost sales, and compared the resulting values to the product-specific, POR, unindexed, weighted-average COPs. In those instances where the product-specific, weighted-average, POR prices are greater than the product-specific, POR, unindexed, weighted-average COPs, we found all sales of those products to have been made at such prices which permit the "recovery of costs within a reasonable period of time."[6] Therefore, these sales would be available for comparison with U.S. sales. As a result of our revised cost-recovery analysis, we increased the number of sales included in our dumping margin calculation. *See* Memorandum to the File "RE: Redetermination of Final Results on Remand – Slip Op. 11-00226," dated December 8, 2011.

---

[6] Section 773(b)(2)(D) of the Act.

## IV.   COMMENTS FROM INTERESTED PARTIES

On December 8, 2011, the Department invited interested parties to comment on the Draft

Results of Redetermination Pursuant to Remand ("Draft Remand").  SeAH and Kurt Orban

Partners, LLC ("Orban") jointly filed comments on December 16, 2011.  In their submission,

SeAH and Orban summarized what they perceive as the legal background behind the

Department's alleged inconsistent interpretations of section 771(35) of the Act and argue that the

Department should use the offset approach as utilized in antidumping investigations.  SeAH and

Orban also submitted revised programming language of how the cost-recovery analysis should

be implemented by using un-indexed quarterly cost figures.  Petitioner, United States Steel

Corporation ("U.S. Steel"), which filed comments on the same date, stated that the Department's

new methodology for the cost-recovery analysis in quarterly cost cases is "inherently biased"

because it employs a two-step approach, which from a standpoint of mathematic probability,

provides every case an additional hurdle to disregard sales as being below cost that is not present

in the normal practice.  As such, U.S. Steel argues that the new methodology should not be used

in the final remand results.

On December 21, 2011, SeAH filed rebuttal comments to U.S. Steel's affirmative

comments on the Department's cost-recovery analysis as implemented in the Draft Remand

weighted-average dumping margin.  SeAH alleges that U.S. Steel's objection is based solely on

alleged "mathematic probabilities" regarding the outcome of the Department's methodology and,

as such, should be rejected by the Department.  U.S. Steel filed rebuttal comments to SeAH and

Orban's affirmative comments on the same date, arguing that the Department more than

adequately demonstrated that its interpretation of section 771(35) of the Act, and that SeAH and

Orban's argument is baseless.  U.S. Steel also contends that SeAH and Orban's comments on the

revised cost-recovery analysis show flaws in the Department's analysis, and reaffirm that the new methodology should not be used in the final remand results in this case.

The Department addresses interested parties' comments as follows:

## Comment 1:  Zeroing

SeAH and Orban contend that the Draft Remand fails to address the issue of statutory interpretation in light of the decisions in *JTEKT* and *Dongbu Steel Co., Ltd. v. United States*, 635 F.3d 1363 (Fed. Cir. 2011) ("*Dongbu*"), and thus fails to articulate a basis for the courts to uphold the Department's decision to calculate a dumping margin of zero on comparisons for which the normal value was less than the U.S. price.

SeAH and Orban assert that neither subsection (A) nor subsection (B) of section 771(35) of the Act use the term "zeroing" nor do they refer to "offsets" for "negative" dumping margins, but rather direct the Department to: 1) calculate "dumping margins" by determining "the amount by which normal value exceeds {U.S} price," and 2) calculate the weighted-average dumping margin using the "aggregate" of these "dumping margins."  SeAH and Orban further assert that in past decisions by the Department, which have been recognized by the reviewing courts, two approaches have been promulgated regarding this issue: 1) the "non-numerical" approach, as referred to by SeAH and Orban, takes the position that, when the normal value is less than U.S. price, the normal value does not "exceed" the U.S. price at all; and 2) the "mathematical" approach, as referred to by SeAH and Orban, takes the position that, when the normal value is less than the U.S. price, it is legitimate to say that normal value "exceeds" the U.S price by a negative amount.  SeAH and Orban contend that the reviewing courts have held that either of these interpretations of the word "exceed" in section 771(35) of the Act, is permissible.

SeAH and Orban assert that on this matter, the Department has not adhered to a consistent position in both investigations and reviews.  SeAH and Orban state that, as referenced in *Dongbu*, the Department now recognizes that in investigations, the dumping margin when the normal value is less than U.S. price is a negative amount, while in reviews the Department takes the position that, when normal value is less than U.S. price, the dumping margin is zero.  SeAH and Orban assert that the CAFC noted in *Dongbu*, that its past decisions had "expressly adopted the position taken by the government in earlier cases that there is no statutory basis for interpreting {section 771(35) of the Act} differently in investigations than in administrative reviews," and noted that its past decision had held that an interpretation of the same term "in two different ways within the same antidumping proceeding without explanation conflicted with the rules of statutory interpretation."  *See Dongbu*, 635 F.3d at 1371-72.  SeAH and Orban then assert that the CAFC required the Department to "provide an explanation for why the statutory language supports its inconsistent approach."  *Id.*  SeAH and Orban assert that the CAFC's position did not significantly change as a result of *JTEKT*, and that the question posed by the CAFC in *JTEKT* of "why is it a reasonable interpretation of the statute to zero in administrative reviews, but not in investigations?" *See JTEKT*, 642 F.3d at 1384.  SeAH and Orban contend that that allegedly unanswered question is why this case was remanded to the Department.

SeAH and Orban contend that instead of addressing the statutory language as required by *Dongbu* and *JTEKT*, the Draft Remand simply repeats the claim made in *JTEKT* that the Department believes it is preferable to interpret section 771(35) of the Act differently in investigations and reviews.  SeAH and Orban assert that the question is whether the statute allows for the inconsistency in approaches, and alleges that the Draft Remand fails to confront this issue.  SeAH and Orban go on to state their understanding of the WTO decisions and alleged

19

"concessions" the Department has made in light of WTO Panel rulings regarding zeroing, and allege that "the Department's continuing refusal to accept the WTO jurisprudence on zeroing is harming the interests of the United States." SeAH and Orban conclude their affirmative comments by stating their belief that section 771(35) of the Act does not allow the "inconsistent" interpretation the Department currently employs, and considers this an issue of statutory construction under U.S. law. As such, SeAH and Orban aver that the Department should revise its Draft Remand using the "mathematical" approach to zeroing, which the Department uses in investigations.

U.S. Steel contends that SeAH and Orban's arguments are baseless, and asserts that the Department more than adequately demonstrated that its interpretation of the statute to permit zeroing in administrative reviews and offsetting in antidumping investigations is reasonable. U.S. Steel avers that zeroing in administrative reviews is consistent with the Department's long-standing, judicially-affirmed interpretation of section 771(35) of the Act, as it directly addresses the potential for foreign companies to undermine the effectiveness of the antidumping laws by masking dumped sales with higher priced sales. U.S. Steel further argues that the Department's decision to discontinue zeroing applies to one, and only one, situation – antidumping investigations using the average-to-average comparison method, which is supported by both the Supreme Court's doctrine in *Charming Betsy*, 6 U.S. at 118 and by the Federal Circuit's holding in *Thyssenkrupp*, 603 F.3d at 934.

U.S. Steel further argues that the Department's different interpretations of section 771(35) of the Act in the context of investigations using average-to-average comparisons and in the context of administrative reviews using the average-to-transaction method are reasonable because they account for the inherent statutory distinctions between the two comparison

methods.  U.S. Steel states that it is well recognized that an agency may properly interpret the

same statutory provision or term differently depending on the context.  *See Chevron*, 467 U.S. at

864; *see also FAG Kugelfischer Georg Schafer AG v. United States*, 332 F.3d 1370, 1371 (Fed.

Cir. 2003) ("*FAG*").  As such, U.S. Steel states that the Department has established in the Draft

Remand that its use of zeroing in this case meets the "reasonable interpretation" standard.

**Department's Position:**

After reviewing comments received from interested parties, the Department continues to

find that it has provided sufficient explanation and justification to support its interpretation of

section 771(35) of the Act as permitting the Department not to provide offsets when aggregating

the results of the average-to-transaction comparisons at issue in this antidumping administrative

review while continuing to interpret the same provision as allowing it to grant offsets in the

limited context of antidumping investigations when aggregating the results of average-to-average

comparisons.

Contrary to the respondents' arguments, the Department has addressed its statutory

interpretation in light of *JTEKT* and *Dongbu* and has provided the legal justification for disparate

interpretations of the same statutory provision, section 771(35) of the Act to be applied in the

context of this review.  The Department has applied its long-standing and judicially affirmed

interpretation of that provision in this case.  The issue in this remand determination is whether

this interpretation continues to be reasonable in light of the fact that, in one limited context

involving antidumping investigations using average-to-average comparisons, the Department has

interpreted the same provision differently.  In this regard, it is important to recognize that the

Department has maintained a well-established interpretation of section 771(35) of the Act and

that the one expressly limited exception to that interpretation does not apply to the instant case.

The Department considers that the additional explanation and justification for the difference between its long-standing interpretation and the new, limited exception to that interpretation are reasonable and understands the Federal Circuit to have affirmed the exception in *US Steel* and *SKF*, inclusive of its limited application to investigations using average-to-average comparisons. Further, as early as *Corus II*, the Federal Circuit expressly recognized that, when the Department abandoned the use of zeroing in investigations involving average-to-average comparisons, "it stated that the new policy did not apply to any other type of proceeding, including administrative reviews." *Corus II*, 502 F.3d at 1374 (citation omitted).   On that basis, the Federal Circuit concluded that "{the Department's} new policy has no bearing on the present appeal . . ." *Id.*

The exception, however, has not become the rule.[7]   If a court were to hold that the limited application of the exception was unlawful, there is no reason to conclude that the Department would be required to allow that exception to swallow the rule.   In other words, there is no reason to assume that the Department's only legal option is to expand the exception to apply in all contexts.   Instead, among other things, the Department could reconsider its decision to create the

---

[7] On December 28, 2010, the Department published a "Proposed Modification" pursuant to Section 123 in which it proposed to implement certain additional WTO dispute settlement reports by adopting a methodology in administrative reviews similar to that used in investigations, namely, average-to-average comparisons with offsets. *See Antidumping Proceedings:   Calculation of the Weighted Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings*, 75 FR 81533 (December 28, 2010) ("*Proposed Modification for Antidumping Administrative Reviews*").   Within that *Proposed Modification for Antidumping Administrative Reviews*, the Department proposed a clear, specific effective date on a prospective basis. *See id.* at 81535.   The Courts have recognized the Department's ability to enforce a specific effective date for changing from one reasonable interpretation to another reasonable interpretation in investigations. *See, e.g., Advanced Tech. and Materials Co., Ltd. v. United States*, CIT No. 10-00012, 2011 Ct. Intl. Trade LEXIS 104 at *24 (Ct. Int'l Trade August 18, 2011) ("*Advanced Tech*") ("{T}he Department's conclusion that the diamond sawblades investigation was not 'pending before the {D}epartment as of January 16, 2007' and therefore did not qualify for the policy change is not arbitrary, capricious, an abuse of discretion, and is in accordance with law.").   Thus, even after the Courts have upheld the Department's change in interpretation of the statute, they have continued to uphold the Department's prior interpretation with respect to a proceeding that pre-dated the effective date of the change. *See, e.g., U.S, Steel* (a 2010 decision upholding the Department's application of its non-zeroing methodology in connection with average-to-average comparisons in investigations) and *Advanced Tech* (a 2011 decision upholding the Department's application of its zeroing methodology in connection with average-to-average comparisons in an investigation).   The administrative context in which the statutory interpretation is applied, *e.g.*, the type of proceeding and/or type of comparison methodology being applied, is no less compelling a basis for upholding concurrent, different interpretations than is the date upon which the statutory interpretation is made.

22

exception. Accordingly, the Department's explanation and justification for the different interpretations of section 771(35)(A) of the Act appropriately begins with an explanation that the interpretation at issue in this administrative review is the Department's well-established interpretation of that provision and not the newer, limited exception.

In particular, the Department generally interprets the word "exceeds" in section 771(35)(A) of the Act as not encompassing "greater than in a negative amount." Put simply, 3 exceeds 2, and 2 does not exceed 3. Recognizing that the Federal Circuit has found the meaning of the word "exceeds" to be ambiguous, the Department considers that, as a general matter, its interpretation of the word "exceeds" is reasonable and the Federal Circuit has agreed. *See Timken*, 354 F.3d at 1342 (upholding the use of zeroing in an administrative review) and *Corus I*, 395 F.3d at 1347 (upholding the use of zeroing in an investigation). Recognizing again that there is ambiguity in the meaning of "exceeds," however, the Department adopted a limited exception to its interpretation only for investigations using average-to-average comparisons. As described above, the Department adopted this exception pursuant to the statutory process set forth in Section 123. In the Section 123 determination, the Department explicitly limited the scope of applicability of this interpretation. *See Final Modification For Investigations*, 71 FR at 77724. In providing this background and explanation, the Department seeks to explain how its interpretation of section 771(35) of the Act as applied in the instant review fits into the larger picture of how the Department reasonably interprets this provision of the statute. Accordingly, as described above, the Department considers that its general interpretation of section 771(35) of the Act remains reasonable for all the same reasons that it has long held this same interpretation, and for the reasons that the Courts repeatedly have upheld the Department's interpretation both in the contexts of administrative reviews and investigations. *See supra* at 8-10.

The Department's exception to its general interpretation, which is limited to the context

of aggregating the results of average-to-average comparisons in investigations, is likewise

justified and reasonable.  As an initial matter, the Department is not prohibited from interpreting

the same statutory term differently.  In fact, the Federal Circuit has held that, based upon a

reasonable explanation, the Department may interpret the same statutory term differently

depending on the context in which that term is being interpreted.  *See FAG*, 332 F.3d at 1373

(upholding the Department's different interpretations within the same proceeding of the term

"foreign like product," contained in section 771(16) of the Act).  Moreover, the Department

disagrees with SeAH and Orban over the relevance of the Supreme Court's decision in *Clark*.  In

*Clark*, the Supreme Court decided whether the Executive Branch could provide different

interpretations of a statute that concerned the detention of certain aliens deemed removable,

depending upon the context.  Clark, 543 U.S. at 378.  The Supreme Court held that if a statue has

criminal implications, then the reviewing court must interpret the statute consistently.  *Id.* at 380-

81.  In so doing, the Supreme Court went to great lengths to emphasize that the criminal

consequences that could flow from the application of the statute necessitated a consistent reading

of its text.  *Id.* (citing *Leocal v. Ashcroft*, 543 U.S. 1, 11-12 n.8 (2004) (explaining that, if a

statute has criminal applications, "the rule of lenity applies" to the Court's interpretation of the

statute even in immigration cases "{b}ecause we must interpret the statute consistently, whether

we encounter its application in a criminal or noncriminal context"); *United States v.*

*Thompson/Center Arms Co.*, 504 U.S. 505, 517-18 n.10 (1992) (plurality opinion) (employing

the rule of lenity to interpret "a tax statute . . . in a civil setting" because the statute "has criminal

applications")).[8]  Because section 771(35) of the Act has no criminal applications or

---

[8] The "rule of lenity" describes "the judicial doctrine holding that a court, in construing an ambiguous criminal
statute that sets out multiple or inconsistent punishments, should resolve the ambiguity in favor of the more lenient

implications, the Department disagrees with SeAH and Orban's view that *Clark* forecloses the Department from interpreting section 771(35)(A) of the Act differently depending upon the context.

Furthermore, as recognized by the Federal Circuit, the Department has previously identified real differences between investigations and administrative reviews. *See JTEKT*, 642 F.3d at 1384-1385 (where the Department pointed to differences between investigations and administrative reviews). In *JTEKT* and *Dongbu*, the CAFC did not invalidate the Department's different interpretations of section 771(35), but rather has sought a further explanation as to why the differences between investigations and administrative reviews are meaningful for purposes of the Department's interpretation of its statute. *See JTEKT*, 642 F.3d at 1385-1385 and *Dongbu*, 635 F.3d at 1373. In this remand determination, the Department provides a further explanation to support its different interpretations of the statute, as sought by the Federal Circuit in *JTEKT* and by the CIT in its Remand Order, and which has already been provided to the court in the course of the *JTEKT* litigation.

Contrary to the respondents' assertions, the Department has demonstrated that it is reasonable, in administrative reviews, to continue to aggregate average-to-transaction comparison results without offsets, while simultaneously, in the limited context of investigations using average-to-average comparisons, to aggregate average-to-average comparison results with offsets. When aggregating comparison results, it is reasonable to take account of what is being aggregated.

With average-to-average comparisons in investigations, offsets are implicitly granted in the calculation of the average export price, and offsets are explicitly granted through implementation of the *Final Modification For Investigations*. An average-to-average

---

punishment." *Black's Law Dictionary*, 1332-33 (7th ed. 1999).

comparison inherently permits transaction-specific export prices above the average normal value to offset transaction-specific export prices below the average normal value within the same averaging group because all transaction-specific export prices are averaged prior to the comparison for each averaging group.  Similarly, once the average export price is compared to the average normal value for each averaging group, the results from all such comparisons are aggregated allowing offsets for comparisons where the average export price exceeds the average normal value between different averaging groups.  Therefore, where the calculation of the overall dumping margin is based upon average export prices, the "average" characteristic (1) implicitly includes offsets when calculating the average export prices, and (2) explicitly includes offsets when aggregating averaging-group comparisons.

In contrast, an overall dumping margin based upon transaction-specific export prices (*i.e.*, average-to-transactions comparisons)  includes no implicit offsets.  With average-to-transaction comparisons, there are no inherent offsets within an averaging group because transaction-specific export prices, not an average export price, are used to compare with the average normal value. Consistent with the absence of implicit offsets, the Department's aggregation of the results of average-to-transaction comparisons excludes explicit offsets as well.  When the results of the transaction-specific comparisons are aggregated, the amounts by which the average normal value exceeds (*i.e.*, is greater than) the transaction-specific export prices are totaled and divided by the total value of all U.S. sales.  Therefore, where the calculation of the overall dumping margin is based upon the transaction-specific export prices, no offsets are granted for sales where the transaction-specific export price exceeds (*i.e.*, is greater than) the comparable average normal value.

This explanation was not provided in the Department's prior explanations. The Department's explanation connects the statutory provisions that discuss the use of an average-to-average and average-to-transaction comparison methods (section 777A(d) of the Act) with the statutory provision that defines dumping margin and weighted-average dumping margin (sections 771(35)(A) and (B) of the Act). The statute itself provides for these different comparison methodologies and the Department has demonstrated that interpreting section 771(35) of the Act differently as it applies to average-to-average comparisons in investigations from average-to-transactions comparisons in administrative reviews is reasonable. Therefore, the respondents' assertions that the Department has not provided sufficient additional explanation in support of its interpretation are erroneous. Neither the CIT nor the Federal Circuit has considered, let alone rejected, this explanation, despite the respondents' arguments to the contrary.

Because the Department is now providing a further reasonable explanation for its interpretation of the statute to support the Department's use of its zeroing methodology when applying an average-to-transaction comparison methodology in administrative reviews, such as it did in the administrative review at issue in this case, while not using its zeroing methodology when applying an average-to-average comparison methodology in investigations, the Department is not changing its decision to use zeroing in this administrative review. Accordingly, the Department is not recalculating the respondents' antidumping duty margins without the use of zeroing.

**Comment 2:  Cost-Recovery**

U.S. Steel asserts that, in cases where the Department decides to use quarterly costs, the Department's new cost-recovery analysis introduces an inherent bias against finding sales below

27

cost. Specifically, U.S. Steel explains that the Department's normal practice for identifying

below-cost sales is to compare prices to a weighted-average cost for the POR. U.S. Steel argues

that the approach used for the draft remand results employs a two-step analysis for determining

sales below cost. U.S. Steel explains that, under the Department's new methodology, prices are

first compared to quarterly costs, then those sales that fall below the quarterly cost are weight

averaged by product and compared to the product-specific, POR, weighted-average COPs. U.S.

Steel also explains that, in those instances where the product-specific, POR, weighted-average

price of the below cost sales exceeds the product-specific, POR, weighted-average COP, the

Department restores all sales of that product to the normal value pool of sales available for

comparison with U.S. sales. U.S. Steel argues that because this two-step approach provides an

additional hurdle for finding sales below cost it cannot be in accordance with the statutory intent.

U.S. Steel concludes that, due to the significant bias against disregarding below-cost sales, the

Department should not use the new methodology for the final remand results of this case.

SeAH and Orban argue that the statute itself provides for a two-step analysis to determine

whether to disregard home market sales. SeAH and Orban point out that finding that sales were

made at below cost prices does not, by itself, provide a sufficient basis for disregarding those

sales. SeAH and Orban assert that the statutory provisions require the Department to *first*

determine whether individual sales have been made at below cost prices; and, *second*, to

determine whether the below cost sales were nevertheless at prices which permit recovery of all

costs within a reasonable period of time.

***Department's Position:***

U.S. Steel's assertion that the Department's revised cost-recovery analysis introduces an

additional hurdle to disregard below-cost sales is unfounded. Whether the Department is

employing the standard, period-wide, cost methodology or the alternative, shorter-period, cost methodology, it must still adhere to the two statutory requirements included in section 773(b)(1) of the Act. The illusionary difference presented by U.S. Steel is created by the fact that for the standard, period-wide, cost methodology, the same POR weighted-average COP values are used for both prongs of the sales-below-cost test, whereas, under the alternative, quarterly, cost methodology, used in the instant case, there are two different sets of COP values which are used: (1) quarterly POR, weighted-average COPs to identify transactions priced below costs and to determine whether these below-cost transactions are in substantial quantities; and (2) annual POR, weighted-average COPs to determine whether costs are recovered within a reasonable period of time.

We have continued to employ the two-step analysis for disregarding sales priced below cost as required by section 773(b)(1) of the Act. With regard to the cost-recovery analysis stipulated in section 773(b)(1)(B) of the Act, section 773(b)(2)(D) of the Act states:

> If prices which are below the per-unit cost of production at the time of sale are above the weighted-average per-unit cost of production for the period of investigation or review, such prices shall be considered to provide for recovery of costs within a reasonable period of time.

Pursuant to this provision, in calculating normal value, the Department will not disregard below-cost sales if the product-specific, weighted-average price for the period of investigation or review is found to be above the product-specific, weighted-average per unit COP for the period of investigation or review (*i.e.*, the cost-recovery analysis), even if those prices were below the "per-unit cost of production" at the time of the sale of that merchandise. The purpose of section 773(b)(2)(D) of the Act is to allow for the recovery of costs within a reasonable period of time. As long as the producer's or exporter's sales prices are above the POR, weighted-average COP, the costs are considered to have been recovered. *See Certain Welded Stainless Steel Pipe From*

*the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 74 FR 31242
(June 30, 2009) and accompanying Issues and Decision Memorandum at Comment 1.

Because the Department determined that it is appropriate to rely on our alternative,
shorter-period, cost methodology for SeAH in this review, in performing the sales-below-cost
test, we first compared the price of each home market sale to the quarterly weighted-average,
COP for the quarter in which the sale was made. Second, for products with below-cost sales
which were made in substantial quantities, we determined whether these below-cost sales
provided for cost recovery within a reasonable period of time. We performed the cost-recovery
analysis using product-specific annual weighted-average COPs, and product-specific annual
weighted-average prices using only those sales found to be below cost. If the product-specific
annual weighted-average price of the below-cost sales is above the product-specific annual POR
weighted-average COP, then none of the below-cost sales of that product will be disregarded,
and will be included in the pool of sales available for comparison with U.S. sales. This approach
complies with the statutory mandate at section 773(b)(2)(D) of the Act to use a weighted-average
cost for the period. It also conforms to the SAA, at 832, which clarifies that "the determination
of cost recovery is based on an analysis of actual weighted-average prices and cost during the
period of investigation or review."

**Comment 3:  Programming Error**

SeAH and Orban argue that the Department's calculations contained a minor
programming error. Specifically, SeAH asserts that the Department used quarterly indexed cost
figures rather than quarterly un-indexed cost figures, to calculate the POR weighted average cost.

U.S. Steel states that SeAH and Orban overlook the fact that given the data reported on
the record of this case, the Department had no choice but to use the indexed quarterly cost

figures.

*Department's Position:*

We agree with SeAH and Orban that, rather than use un-indexed quarterly costs to calculate the POR weighted average cost as intended, the Department erroneously used quarterly indexed cost figures. Accordingly, the Department has revised the program used for the final results. We disagree with U.S. Steel that un-indexed quarterly costs were not on the record of this case. *See* Memorandum from Joshua Morris to the File entitled "Redetermination of Final Results on Remand – Slip Op. 11-00226," dated January 11, 2012, with references to record evidence.

## V.   RESULTS OF REDETERMINATION

In accordance with the Court's Remand Order, and consistent with the Department's interpretation of the Act described above, the Department on remand continues to apply its zeroing methodology in calculating weighted-average dumping margins for SeAH, but has adjusted its cost-recovery analysis to cover the costs for the POR instead of a quarterly cost basis. The adjustment to the cost-recovery methodology has resulted in a recalculation of SeAH's dumping margin. Based on our revisions, SeAH's weighted-average dumping margin is 3.87 percent.

The Department issues these results of redetermination pursuant to the Remand Order of the Court in *SeAH Steel Corporation and Kurt Orban Partners, LLC v. United States (Defendant) and Allied Tube Conduit et al. (Defendants-Intervenors)*, Court No. 11-00226 (Ct. Int'l Trade October 13, 2011).


_____
Paul Piquado
Assistant Secretary
  for Import Administration


_____
Date