**Slip Op. 13-124**

UNITED STATES COURT OF INTERNATIONAL TRADE

---

SEAH STEEL CORPORATION and
KURT ORBAN PARTNERS, LLC,      :

                              :

              *Plaintiffs*,      :

                              :

       v.                     :

                              :

UNITED STATES,                :

                              :          Consol. Court No. 11-00226

              *Defendant*,       :

                              :

       and                    :

                              :

ALLIED TUBE AND CONDUIT, TMK
IPSCO TUBULAR, and UNITED      :
STATES STEEL CORPORATION,

                              :

              *Defendant-Intervenors*.

---

[Sustaining U.S. Department of Commerce's Final Results of Redetermination Pursuant to Remand]

Dated:  September 25, 2013

Jeffrey M. Winton, Law Office of Jeffrey M. Winton PLLC, of Washington, D.C., for Plaintiffs.  With him on the brief was Sung E. Chang.

Joshua E. Kurland and Michael D. Panzera, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant.  With them on the brief were Stuart F. Delery, Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, and Franklin E. White, Jr., Claudia Burke, and Patricia M. McCarthy, Assistant Directors, Commercial Litigation Branch.  Of counsel on the brief was David W. Richardson, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

Roger B. Schagrin, Schagrin Associates, of Washington, D.C., for Defendant-Intervenors Allied Tube and Conduit and TMK IPSCO Tubular.  With him on the brief were John W. Bohn and Michael J. Brown.

Jeffrey D. Gerrish, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, D.C. for Defendant-Intervenor United States Steel Corporation.  With him on the brief was Robert E. Lighthizer.

# OPINION

RIDGWAY, Judge:

The two actions consolidated herein were brought by Plaintiffs SeAH Steel Corporation and Kurt Orban Partners, LLC ("KOP") – respectively, a Korean producer and exporter of circular welded non-alloy steel pipe and a U.S. importer of the same merchandise – to contest the Final Results of the U.S. Department of Commerce's seventeenth administrative review of the antidumping duty order covering such pipe from Korea. *See* SeAH First Amended Complaint; KOP Complaint;[1] Circular Welded Non-Alloy Steel Pipe From the Republic of Korea:  Final Results of the Antidumping Duty Administrative Review, 76 Fed. Reg. 36,089 (June 21, 2011) ("Final Results").[2]

Now pending before the Court are the Final Results of Redetermination Pursuant to Remand, which Commerce filed with the Court following the grant of a voluntary remand sought by the Government. *See generally* Final Results of Redetermination Pursuant to Remand ("Remand Results").  All parties – including Defendant-Intervenors Allied Tube and Conduit, TMK IPSCO Tubular, and United States Steel Corporation (all of which are U.S. domestic producers of circular welded non-alloy steel pipe) – have conferred, and have advised that no party intends to file comments on the Remand Results.  *See* Joint Status Report (Sept. 6, 2013).  The Government

---

[1]KOP filed its Complaint in Kurt Orban Partners, LLC v. United States, *et al*., Court No. 11-00261.  That action was then consolidated into SeAH's action, Court No. 11-00226.

[2]The Final Results were amended shortly after they issued, to correct a ministerial error in the Final Results as to Hyundai HYSCO.  *See* Circular Welded Non-Alloy Steel Pipe From the Republic of Korea:  Amended Final Results of the Antidumping Duty Administrative Review, 76 Fed. Reg. 44,304 (July 25, 2011).  No other aspect of the Final Results was affected.  *Id.*

therefore urges that the Remand Results be sustained in their entirety.  *Id.*

Jurisdiction lies under 28 U.S.C. § 1581(c) (2006).[3]  As summarized below, the Remand Results must be sustained, and judgment entered accordingly.

## I. Background

In this consolidated action, SeAH and KOP contest the Final Results of the U.S. Department of Commerce's seventeenth administrative review of the antidumping duty order covering circular welded non-alloy steel pipe from Korea.  *See* SeAH First Amended Complaint; KOP Complaint; Final Results, 76 Fed. Reg. at 36,089.  The pipe and tubes in question are commonly known as "standard pipes and tubes," and are generally used for "the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air-conditioning units, automatic sprinkler systems, and other related uses." *Id.*, 76 Fed. Reg. at 36,090.[4]  The period of review is November 1, 2008 through October 31, 2009.  *See id.*, 76 Fed. Reg. at 36,089.  Two claims are here at issue.

Both SeAH and KOP challenged Commerce's use of the agency's "zeroing" methodology, asserting that "Commerce improperly treated negative dumping margins on individual transactions as zero margins" in calculating weighted-average dumping margins, and arguing that the practice of zeroing in such circumstances was "inconsistent with Commerce's own prior interpretation of the

---

[3]All citations to federal statutes are to the 2006 edition of the United States Code.

[4]Standard pipe also may be used for "light load-bearing applications, such as for fence tubing, and as structural pipe tubing used for framing and as support members for reconstruction or load-bearing purposes in the construction, shipbuilding, trucking, farm equipment, and other related industries."  *See* Final Results, 76 Fed. Reg. at 36,090.

antidumping statute in other contexts" and that the agency had failed to provide "a reasonable

explanation as to why such a methodology is permitted by the relevant provisions of the statute" in

light of certain then-recent decisions of the U.S. Court of Appeals for the Federal Circuit.  SeAH

First Amended Complaint ¶ 6(1) (*citing* <u>Dongbu Steel Co. v. United States</u>, 635 F.3d 1363 (Fed. Cir.

2011); <u>JTEKT Corp. v. United States</u>, 642 F.3d 1378 (Fed. Cir. 2011)); KOP Complaint ¶ 6(1)

(same).

   In addition, invoking a then-recent decision of this Court, SeAH raised a second challenge

to the Final Results, targeting Commerce's cost recovery analysis.  Specifically, SeAH asserted that,

"[f]or purposes of determining whether SeAH's home-market sales were at prices that permitted a

recovery of all costs within a reasonable period of time, Commerce did not compare home-market

prices to the weighted-average per unit cost of production for the period of review, . . . but instead

indexed the costs on a quarterly basis using a methodology . . . inconsistent with the relevant

provisions of the antidumping statute."  SeAH First Amended Complaint ¶ 6(2) (*citing* <u>SeAH Steel</u>

<u>Corp. v. United States</u>, 35 CIT ____, 764 F. Supp. 2d 1322, 1326-35 (2011) ("<u>SeAH I</u>")).[5]

   Shortly after the actions filed by SeAH and KOP were consolidated, the Government sought,

---

[5]In addition to the two specific claims set forth above, SeAH's First Amended Complaint asserts a third claim alleging generally that "Commerce's determination [in the Final Results] contained other errors of law and fact that will become more apparent after a full review of the administrative record."  SeAH First Amended Complaint ¶ 6(3).  Identical language appears in the KOP Complaint.  *See* KOP Complaint ¶6(2).  The Government objected to such "placeholder" language as "inappropriately vague and impermissible insofar as it fails to state a claim upon which relief can be granted," and advised that the Government planned to file motions to dismiss to that extent as to both SeAH and KOP "after the conclusion of the voluntary remand process." Defendant's Unopposed Motion for Voluntary Remand at 2 n.1.  However, neither SeAH nor KOP ever sought to rely on the quoted expansive language, and the Government filed no motions to dismiss.

and was granted, a voluntary remand to afford Commerce the opportunity to "reconsider and, as necessary, provide additional explanation" as to the two issues raised in the consolidated actions – *i.e.*, the agency's use of zeroing, and the agency's cost recovery analysis vis-a-vis SeAH. Defendant's Unopposed Motion for Voluntary Remand; Order (Oct. 13, 2011). Commerce filed the Remand Results in due course. Not long thereafter, the Court granted the request of SeAH and KOP for a stay of all proceedings pending a final Court of Appeals determination on zeroing in light of the decisions in Dongbu and JTEKT. *See* Plaintiffs' Motion for Stay of Proceedings; Order (March 5, 2012); Dongbu, 635 F.3d 1363; JTEKT, 642 F.3d 1378. The stay was lifted following the Court of Appeals' decision in Union Steel. *See* Order (June 26, 2013); Union Steel v. United States, 713 F.3d 1101 (Fed. Cir. 2013).

The Remand Results thus are now ripe for review.

## II. Analysis

On remand, Commerce reconsidered both the use of the agency's zeroing methodology in the underlying administrative review, as well as the cost recovery analysis that the agency applied to SeAH. *See generally* Remand Results at 1-2. In the Remand Results, Commerce further explained its zeroing methodology, "consistent with JTEKT" and other precedent. *See id.* (*citing* JTEKT, 642 F.3d 1378). In addition, Commerce revised its cost recovery analysis to comply with SeAH I. *See generally* Remand Results at 1-2; SeAH I, 35 CIT at ____, 764 F. Supp. 2d at 1326-35. As a result of Commerce's redetermination on remand, SeAH's final dumping margin decreased to 3.87%. Remand Results at 2, 31.

As discussed below, Commerce's Remand Results are generally responsive to the order

granting a voluntary remand.  *See* Remand Results; Order (Oct. 13, 2011).  Further, the parties have

advised that no party plans to file comments on the Remand Results; and the Government urges that

the Remand Results be affirmed.  *See* Joint Status Report.  The Remand Results therefore must be

sustained.

A.  Commerce's Practice of "Zeroing"

In the course of the administrative review, SeAH objected that Commerce was unlawfully

zeroing negative dumping margins in calculating SeAH's weighted-average dumping margin.  *See*

SeAH Administrative Case Brief (Jan. 31, 2011) at 2-3, 10-13; *see also* Issues and Decision

Memorandum for the 2008-2009 Administrative Review of Circular Welded Non-Alloy Steel Pipe

from the Republic of Korea at 3 ("Issues & Decision Memorandum").[6]   KOP raised a similar

---

[6]Dongbu provides a relatively succinct, general overview of the practice of "zeroing":

> In antidumping proceedings, Commerce determines antidumping duties for a
> particular product by comparing the product's "normal value" (the price a producer
> charges in its home market) with the export price of comparable merchandise. . . .
> Commerce uses different comparisons at the investigation stage than at the
> administrative review stage. . . . Regardless of the stage, Commerce first calculates
> a "dumping margin" equal to "the amount by which the normal value exceeds the
> export price or constructed export price." . . . Next, Commerce calculates a weighted-
> average dumping margin "by dividing the aggregate dumping margins determined
> for a specific exporter or producer by the aggregate . . . constructed export prices of
> such exporter or producer." . . . In this second step, Commerce has historically used
> a controversial methodology called "zeroing" whereby only positive dumping
> margins (*i.e.*, margins for sales of merchandise sold at dumped prices) are aggregated
> and [ – in contrast – ] negative margins (*i.e.*, margins for sales of merchandise sold
> at non-dumped prices) are given a value of zero.  Alternatively, Commerce can use
> "offsetting" methodology whereby the positive and negative dumping margins are
> all aggregated to reduce the final margin.

Dongbu, 635 F.3d at 1365-66; *see also* JTEKT, 642 F.3d at 1383 (explaining zeroing as "the

challenge as to the calculation of antidumping duties on its imports.  *See* KOP Complaint ¶ 6(1).

In particular, SeAH and KOP argued that Commerce's interpretation of 19 U.S.C. § 1677(35) as

permitting zeroing in administrative reviews but not in antidumping investigations could not be

sustained as reasonable under Chevron.  *See generally* Issues & Decision Memorandum at 3; SeAH

First Amended Complaint ¶ 6(1); KOP Complaint ¶ 6(1); Chevron, U.S.A., Inc. v. Natural Res. Def.

Council, Inc., 467 U.S. 837 (1984).  The issue was remanded to Commerce to permit the agency to

specifically address the statutory interpretation question as framed by the Court of Appeals in

JTEKT.  *See* Order (Oct. 13, 2011); JTEKT, 642 F.3d 1378.

      In its Draft Remand Results, Commerce traced the contentious history of its much-litigated

zeroing methodology.  *See generally* Draft Remand Results at 4-15.  Commerce emphasized that,

on "multiple occasions," the Court of Appeals had "squarely addressed the reasonableness of

[Commerce's] zeroing methodology in administrative reviews and unequivocally held that the

[agency] reasonably interpreted the relevant statutory provision as permitting zeroing."  Draft

Remand Results at 4 (*citing* Koyo Seiko Co. v. United States, 551 F.3d 1286, 1290-91 (Fed. Cir.

2008); NSK Ltd. v. United States, 510 F.3d 1375, 1379-80 (Fed. Cir. 2007); Corus Staal BV v.

United States, 502 F.3d 1370, 1372-75 (Fed. Cir. 2007) ("Corus II"); Corus Staal BV v. Dep't of

Commerce, 395 F.3d 1343 (Fed. Cir. 2005) ("Corus I"); Timken Co. v. United States, 354 F.3d

1334, 1340-45 (Fed. Cir. 2004)).  The Draft Remand Results noted that 19 U.S.C. § 1677(35) –

---

practice whereby the values of positive dumping margins are used in calculating the overall margin,
but negative dumping margins are included in the sum of margins as zeroes"); Union Steel, 713 F.3d
at 1104 (explaining zeroing as "a methodology . . . where negative dumping margins (*i.e.*, margins
of sales of merchandise sold at nondumped prices) are given a value of zero and only positive
dumping margins (*i.e.*, margins for sales of merchandise sold at dumped prices) are aggregated").

which authorizes the agency to apply zeroing in antidumping duty proceedings – states that "[t]he term 'dumping margin' means the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise," and explained that the Court of Appeals repeatedly held that language to be ambiguous as to whether it *requires* zeroing.  Draft Remand Results at 4-5 (*citing*, *inter alia*, Timken, 354 F.3d at 1342); 19 U.S.C. § 1677(35)(A).

Observing that the agency itself has interpreted 19 U.S.C. § 1677(35) to permit zeroing in both administrative reviews and antidumping duty investigations, the Draft Remand Results stated that "[t]he Federal Circuit upheld this interpretation separately in the context of both antidumping duty investigations and administrative reviews as a reasonable resolution of statutory ambiguity concerning the treatment of comparison results that show normal value does not exceed export price or constructed export price."  Draft Remand Results at 5 (*citing* SKF USA Inc. v. United States, 630 F.3d 1365, 1375 (Fed. Cir. 2011); Corus I, 395 F.3d at 1347-49; Timken, 354 F.3d at 1340-45).

The Draft Remand Results further noted that, in 2005, a World Trade Organization panel concluded that the United States violated its international obligations under the General Agreement on Tariffs and Trade ("GATT") 1994 when Commerce employed the zeroing methodology in average-to-average comparisons in certain challenged antidumping duty investigations.  Draft Remand Results at 5-6 (*citing* Report of the Panel, United States – Laws, Regulations and Methodology for Calculating Dumping Margins (Zeroing), WT/DS294/R (Oct. 31, 2005)).  Commerce explained that, "[i]n light of the adverse WTO . . . decision and the ambiguity that the Federal Circuit found inherent in the statutory text, [Commerce] abandoned its prior litigation position – [*i.e.*, its position] that no difference between antidumping duty investigations and

administrative reviews exists for purposes of using zeroing in antidumping proceedings – and departed from its longstanding and consistent practice by ceasing the use of zeroing in the limited context of average-to-average comparisons in antidumping duty investigations."  Draft Remand Results at 6 (*citing* Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification, 71 Fed. Reg. 77,722 (Dec. 27, 2006) ("Revised Methodology Eliminating Use of Zeroing in Average-to-Average Comparisons in Antidumping Duty Investigations")).  However, as the Draft Remand Results indicated, Commerce made no change to its practice of zeroing in other types of comparisons, including average-to-transaction comparisons in administrative reviews.  *See* Draft Remand Results at 6 (*citing* Revised Methodology Eliminating Use of Zeroing in Average-to-Average Comparisons in Antidumping Duty Investigations, 71 Fed. Reg. at 77,724).

The Draft Remand Results further stated that "[t]he Federal Circuit subsequently upheld [Commerce's] decision to cease zeroing in average-to-average comparisons in antidumping duty investigations whilst recognizing that [Commerce] limited its change in practice to certain investigations and continued to use zeroing when making average-to-transaction comparisons in administrative reviews."  Draft Remand Results at 6 (*citing* U.S. Steel Corp. v. United States, 621 F.3d 1351, 1355 n.2, 1362-63 (Fed. Cir. 2010)).  According to Commerce, in U.S. Steel, the Federal Circuit implicitly "acceded to the possibility of disparate, yet equally reasonable interpretations" of 19 U.S.C. § 1677(35) for purposes of antidumping duty investigations, on the one hand, and administrative reviews, on the other.  Draft Remand Results at 7 (*citing* U.S. Steel, 621 F.3d at 1360-63).

Commerce concluded its analysis in the Draft Remand Results by outlining three arguments in support of its position that the agency's interpretation of 19 U.S.C. § 1677(35) "reasonably resolves the ambiguity inherent in the statutory text." Draft Remand Results at 8. Commerce first argued that the agency "has, with one limited exception, maintained a long-standing, judicially-affirmed interpretation of [19 U.S.C. § 1677(35)] in which [the agency] does not consider a sale to the United States as dumped if normal value does not exceed export price." *Id.* at 8. According to the Draft Remand Results, "[p]ursuant to this interpretation, [Commerce] gives such sale a dumping margin of zero, which reflects that no dumping has occurred, when calculating the aggregate weighted-average dumping margin." *Id.* at 8; *see also id.* at 8-10 (asserting that "The Department Used a Reasonable and Judicially-Affirmed Interpretation of [19 U.S.C. § 1677(35)]"). Second, the Draft Remand Results argued that the referenced "limited exception" to the above-described interpretation "does not amount to an arbitrary departure from established practice, as the Executive Branch adopted and implemented the approach in response to a specific international obligation pursuant to the procedures established by the Uruguay Round Agreements Act for such changes in practice with full notice, comment, consultation with the Legislative Branch, and explanation." *Id.* at 8; *see also id.* at 10-12 (asserting that "The Executive Branch's Limited Implementation of an Adverse Finding of the WTO Dispute Settlement Body Results in a Reasonable Interpretation of [19 U.S.C. § 1677(35)]"). And, third, the Draft Remand Results argued that "[Commerce's] interpretation reasonably resolves the ambiguity in [19 U.S.C. § 1677(35)] in a way that accounts for the inherent differences between the result of an average-to-average comparison, on the one hand, and the result of an average-to-transaction comparison, on the other." *Id.* at 8; *see also id.* at

12-15 (asserting that "The Department's Interpretation Reasonably Accounts for Inherent Differences Between The Results of Distinct Comparison Methodologies").

In their comments filed with Commerce, SeAH and KOP criticized the Draft Remand Results for failing to directly and adequately address the precise issue of statutory interpretation that the Court of Appeals highlighted in JTEKT and Dongbu – specifically, "why is it a reasonable interpretation *of the statute* to zero in administrative reviews, but not in investigations?" SeAH/KOP Comments on Draft Remand Results at 8 (*quoting* JTEKT, 642 F.3d at 1384 (emphasis added)); *see also* SeAH/KOP Comments on Draft Remand Results at 2, 3-11; Dongbu, 635 F.3d at 1371-73 (requiring that Commerce "provide an explanation for why *the statutory language* supports [the agency's] inconsistent interpretation" of 19 U.S.C. § 1677(35) (emphasis added)). SeAH and KOP argued that, "instead of addressing the statutory language, as required by Dongbu and JTEKT, the draft remand determination simply repeat[ed] the claim made [by Commerce] in JTEKT that [Commerce] believes it is preferable, in light of the allegedly different purposes of the proceedings, to interpret [19 U.S.C. § 1677(35)] inconsistently in [antidumping] investigations and [administrative] reviews." SeAH/KOP Comments on Draft Remand Results at 8. SeAH and KOP argued that the Draft Remand Results thus still "fail[ed] to address the issue of statutory interpretation addressed by [Dongbu and JTEKT], and thus fail[ed] to articulate a basis for the courts to uphold [Commerce's] decision [in the administrative review here] to calculate a dumping margin of zero on comparisons for which the normal value was less than the U.S. price." *Id*. at 2. SeAH and KOP concluded that the statute does not allow "inconsistent" interpretations for purposes of antidumping duty investigations *versus* administrative reviews, and urged Commerce to revise the

Draft Remand Results "to recalculate the dumping margins for all comparisons for SeAH and KOP using an interpretation of the [statute] . . . that is consistent with the interpretation applied in investigations." *Id.* at 11.

In contrast, U.S. Steel asserted that the Draft Remand Results "more than adequately demonstrated that [Commerce's] interpretation of the statute to permit zeroing in administrative reviews and offsetting in certain antidumping investigations is reasonable." U.S. Steel Rebuttal Comments on Draft Remand Results at 2; *see generally id.* at 2-6. U.S. Steel further argued that Commerce's "different interpretation of § 1677(35) to sanction zeroing in administrative reviews using the average-to-transaction method but not in investigations using the average-to-average method is reasonable because it accounts for the inherent differences" between the two comparison methods. *Id.* at 5. U.S. Steel thus concluded that the Draft Remand Results demonstrated "that [Commerce's] use of zeroing in this case meets the 'reasonable interpretation' standard" applicable to matters of statutory construction. *Id.* at 6 (*quoting* Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (explaining that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another")).

In the Remand Results that it filed with the Court, Commerce elaborated on the explanation of zeroing that it had proffered in the Draft Remand Results. Commerce noted that, "[i]n JTEKT and Dongbu, the [Court of Appeals] did not invalidate [Commerce's] different interpretations of [19 U.S.C. § 1677(35)], but rather . . . sought a further explanation as to why the differences between investigations and administrative reviews are meaningful for purposes of [Commerce's] interpretation of its statute." Remand Results at 25 (*citing* JTEKT, 642 F.3d at 1385; Dongbu, 635

F.3d at 1373).  According to Commerce, the Remand Results "provide[] a further explanation to support [the agency's] different interpretations of the statute, as sought by the Federal Circuit in JTEKT and by the CIT in its Remand Order, and which [was] already . . . provided to the court in the course of the JTEKT litigation."  Remand Results at 25.

According to Commerce, the Remand Results "demonstrate[] that it is reasonable, in administrative reviews, to continue to aggregate average-to-transaction comparison results without offset, while simultaneously, in the limited context of [antidumping] investigations using average-to-average comparisons, to aggregate average-to-average comparison results with offsets."  Remand Results at 25.  Commerce emphasized its view that, "[w]hen aggregating comparison results, it is reasonable to take account of what is being aggregated."  *Id.*

Thus, Commerce explained: "With average-to-average comparisons in investigations, offsets are implicitly granted in the calculation of the average export price, and offsets are explicitly granted through implementation of [the agency's Revised Methodology Eliminating Use of Zeroing in Average-to-Average Comparisons in Antidumping Duty Investigations].  An average-to-average comparison inherently permits transaction-specific export prices above the average normal value to offset transaction-specific export prices below the average normal value within the same averaging group because all transaction-specific export prices are averaged prior to the comparison for each averaging group.  Similarly, once the average export price is compared to the average normal value for each averaging group, the results from all such comparisons are aggregated allowing offsets for comparisons where the average export price exceeds the average normal value between different averaging groups."  Remand Results at 25-26.

In the Remand Results, Commerce sought to draw a sharp distinction between the analysis described above (applicable in antidumping investigations involving average-to-average comparisons) and the agency's analysis in administrative reviews.   Specifically, Commerce explained: "In contrast, an overall dumping margin based upon transaction-specific export prices (*i.e.*, average-to-transaction[] comparisons) includes no implicit offsets.  With average-to-transaction comparisons, there are no inherent offsets within an averaging group because transaction-specific export prices, not an average export price, are used to compare with average normal value.  Consistent with the absence of implicit offsets, [Commerce's] aggregation of the results of average-to-transaction comparisons excludes explicit offsets as well.  When the results of the transaction-specific comparisons are aggregated, the amounts by which the average normal value exceeds (*i.e.*, is greater than) the transaction-specific export prices are totaled and divided by the total value of all U.S. sales.  Therefore, where [ – as in administrative reviews – ] the calculation of the overall dumping margin is based upon the transaction-specific export prices, no offsets are granted for sales where the transaction-specific export price exceeds (*i.e.*, is greater than) the comparable average normal value."  Remand Results at 26.

According to the Remand Results, the explanation that is quoted above "was not provided in [Commerce's] prior explanations."  Remand Results at 27.  Commerce states that the more complete explanation in the Remand Results filed with the Court "connects the statutory provisions that discuss the use of . . . average-to-average and average-to-transaction comparison methods ([19 U.S.C. § 1677f-1(d)]) with the statutory provision that defines dumping margin and weighted-average dumping margin ([19 U.S.C. § 1677(35)(A)-(B)])."  *Id.*  Commerce noted that "[t]he statute

itself provides for these different comparison methodologies," and asserted that the explanation in

the Remand Results "demonstrated that interpreting [19 U.S.C. § 1677(35)] differently as it applies

to average-to-average comparisons in investigations from average-to-transaction[] comparisons in

administrative reviews is reasonable." *Id.* The Remand Results therefore dismissed as "erroneous"

SeAH's and KOP's claims that Commerce had failed to "provide[] sufficient additional explanation

in support of its interpretation." *Id.*

Concluding that "[n]either the [Court of International Trade] nor the Federal Circuit has

considered, let alone rejected, [the more complete] explanation [set forth in the Remand Results],"

Commerce stated that the Remand Results filed with the Court "now provid[e] a further reasonable

explanation for [the agency's] interpretation of the statute to support the [agency's] use of its zeroing

methodology . . . in administrative reviews, such as it did in the administrative review at issue in this

case, while not using its zeroing methodology when applying an average-to-average comparison

methodology in [antidumping] investigations." Remand Results at 27. As such, Commerce declined

to change its decision concerning the use of zeroing in the administrative review at issue here, and

declined to "recalculat[e] the respondents' antidumping duty margins without the use of zeroing"

in the Remand Results. *Id.*

Some time after Commerce filed the Remand Results here, the Court of Appeals' decision

issued in Union Steel. *See* Union Steel, 713 F.3d 1101. Union Steel ruled decisively in Commerce's

favor, squarely holding that "[n]o rule of law precludes Commerce from interpreting 19 U.S.C. §

1677(35) differently in different circumstances as long as it provides an adequate explanation"

(Union Steel, 713 F.3d at 1110); and, significantly, the agency rationale that was articulated – and

was found to pass muster – in Union Steel closely tracks the explanation set forth in the Remand

Results in this action, as summarized above.  *Compare* Union Steel, 713 F.3d at 1108-09 (discussing

differences in comparison methodologies used in different types of proceedings) *and* Remand

Results at 12-15 (same); *compare also* Union Steel, 713 F.3d at 1109-10 (discussing implementation

of adverse WTO ruling) *and* Remand Results at 10-12 (same).

Conceivably this matter could be remanded to Commerce once again, to permit the agency

(and the parties) to specifically and directly address the Court of Appeals' decision in Union Steel.

However, there would be little point to such a second remand, particularly given the striking

similarities between the rationale set forth in the Remand Results in this action and the explanation

sustained in Union Steel.  Moreover, no party has sought another remand.  Quite to the contrary,

SeAH and KOP have now advised that – in light of Union Steel – they no longer contest

Commerce's use of zeroing in the instant administrative review.  *See* Joint Status Report.

Under these circumstances, the Remand Results on the issuing of zeroing must be sustained.

## B.  Commerce's Cost Recovery Analysis

In addition to the zeroing claim that it pressed together with KOP (discussed above), SeAH

also asserted that, in conducting its cost recovery analysis in the course of the administrative review,

Commerce unlawfully excluded below-cost, home-market sales from its analysis of whether such

sales were made above the period of review weighted-average cost of production.  *See* SeAH

Administrative Case Brief at 3-4, 14-16; *see also* Issues & Decision Memorandum at 6-7.[7]

---

[7]Commerce's cost recovery test determines which particular sales the agency includes in
calculating the "Normal Value" of subject merchandise in the home market.  *See* SeAH I, 35 CIT

SeAH concurred in Commerce's decision to use quarterly costs in the agency's calculations as to SeAH.  *See* SeAH Administrative Case Brief at 3, 14.  However, SeAH argued that the cost recovery test that Commerce applied was not consistent with the statute.  *See generally id.* at 3-4, 14-16.  SeAH maintained that the statute requires that Commerce "test the sales that fall below the quarterly weighted average [cost of production] against the weighted average per unit [cost of production] for the [period of review] and, if those sales are above [the] [period of review]-weighted average cost, [to include the sales] in the calculation of SeAH's dumping margin."  *Id.* at 14.

Specifically, SeAH argued that, while 19 U.S.C. §§ 1677b(b)(1)(A) and (B) permit Commerce to disregard sales which "have been made within an extended period of time in substantial quantities" and "were not at prices which permit the recovery of all costs within a reasonable period of time," 19 U.S.C. § 1677b(b)(2)(D) requires that below-cost prices that are above the period of review weighted-average cost of production "be considered to provide for recovery of costs within a reasonable period of time."  SeAH Administrative Case Brief at 14; *see also* Issues & Decision Memorandum at 6-7.  In short, SeAH asserted, the "cost recovery" provision of the statute – 19 U.S.C. § 1677b(b)(2)(D) – "clearly and unambiguously directs that prices that are above the weighted-average per unit [cost of production] for the period of review . . . 'shall be considered to provide for recovery of costs within a reasonable period of time.'"  SeAH Administrative Case Brief at 4; *see also id.* at 14.  Thus, SeAH concluded, "sales that are above the [period of review] weighted-average per unit [cost of production] *cannot* lawfully be excluded under the cost test" – a point on which SeAH prevailed in SeAH I.  SeAH Administrative Case Brief at

at ____, 764 F. Supp. 2d at 1326.

4;  SeAH I, 35 CIT at ____, 764 F. Supp. 2d at 1326-35.  SeAH urged that, in the Final Results,

Commerce "should continue to use quarterly costs but should apply the cost recovery test to sales

that were excluded as below cost and include them in the [agency's] margin analysis if they [were]

found to be above the weighted average per unit [cost of production] for the [period of review]."

SeAH Administrative Case Brief at 16.

        Commerce nevertheless made no change in its methodology for purposes of the Final Results

of the administrative review.  Commerce conducted its cost recovery analysis by comparing SeAH's

below-cost, home-market sales prices to the product-specific, indexed, period of review weighted-

average per-unit cost of production.  *See* Issues & Decision Memorandum at 8-9, 9-10; *see also*

Remand Results at 3.  To calculate the product-specific, indexed, period of review weighted-average

cost of production, Commerce restated SeAH's reported quarterly costs of production on a year-end

basis (using an indexation methodology), calculated a weighted-average cost of production for the

period of review, and then restated the period of review weighted-average cost of production for

each quarter using the same indexation methodology.  *See* Issues & Decision Memorandum at 8-9,

9-10; *see also* Remand Results at 3-4.

        In the meantime, following issuance of the Final Results, the decision in SeAH I became

final.  *See generally* SeAH I, 35 CIT at ____, 764 F. Supp. 2d at 1326-35.  In that case, the court

held that "the language of the cost recovery statute unambiguously requires Commerce to use one

single benchmark value – the weighted average per unit [cost of production] for the [period of

review] – in the [agency's] cost recovery analysis" (essentially the position that SeAH took at the

agency level in the administrative review here).  *Id.*, 35 CIT at ____, 764 F. Supp. 2d at 1333.  SeAH

I directed Commerce in that case to conduct its cost recovery analysis using the unindexed, weighted-average period of review cost of production. *See id.*, 35 CIT at ____, 764 F. Supp. 2d at 1333-36.  The Government's request for a voluntary remand in this action was granted, to allow Commerce to reevaluate its cost recovery analysis in the administrative review here in light of the decision in <u>SeAH I</u>.  *See* Order (Oct. 13, 2011); <u>SeAH I</u>, 35 CIT at ____, 764 F. Supp. 2d at 1333-35.

In its Draft Remand Results, Commerce re-evaluated the cost recovery analysis that the agency had used in calculating the Final Results for SeAH.  *See generally* Draft Remand Results at 1, 15-16.  To conform to the ruling in <u>SeAH I</u>, Commerce revised its methodology for purposes of all cases such as this, *i.e.*, cases where Commerce determines that a quarterly costing approach is appropriate.  *See id.* at 15 (*citing* Certain Welded Carbon Steel Pipe and Tube from Turkey; Notice of Preliminary Results of Antidumping Duty Administrative Review, 76 Fed. Reg. 33,204, 33,208 (June 8, 2011) (explaining, and applying, Commerce's "new approach to testing for cost recovery when using [its] alternative quarterly cost methodology")).  Commerce then applied that revised cost recovery analysis for SeAH for this administrative review.  *See* Draft Remand Results at 15-16.

Specifically, on remand, in performing the sales-below-cost test, Commerce identified those sales with prices below the period of review indexed weighted-average costs of production in the Final Results.  *See* Remand Results at 16, 30; Draft Remand Results at 15-16.  For those products with below-cost sales made in substantial quantities, Commerce calculated product-specific, weighted-average period of review prices for the below-cost sales, and compared the resulting values to the product-specific period of review unindexed weighted-average costs of production.

*See* Remand Results at 16, 30; Draft Remand Results at 16.  Commerce concluded that – where the product-specific, weighted-average period of review prices were greater than the product-specific period of review unindexed weighted-average costs of production – all such sales were made at prices that permit the "recovery of costs within a reasonable period of time."  Remand Results at 16; *see also id.* at 30; Draft Remand Results at 16; 19 U.S.C. § 1677b(b)(2)(D).  Such sales therefore were available for comparison with U.S. sales.  *See* Remand Results at 16, 30; Draft Remand Results at 16.  As a result of Commerce's use of its revised cost recovery analysis in the Draft Remand Results, Commerce increased the number of sales included in its dumping margin calculation for SeAH.  *See* Remand Results at 16 (and documentation cited there); Draft Remand Results at 16 (same).  The Draft Remand Results thus calculated SeAH's weighted-average dumping margin to be 3.90% (down from 4.99%).  *See* Draft Remand Results at 16; Final Results, 76 Fed. Reg. at 36,090 (specifying SeAH margin as 4.99%).

In its comments to Commerce on the Draft Remand Results, U.S. Steel objected to the agency's revised cost recovery analysis methodology as "inherently biased," because the analysis involves a two-step approach, which – according to U.S. Steel, "[p]urely from the standpoint of mathematic probability" – necessarily builds into every quarterly cost case "an additional hurdle to finding sales below cost that is simply not present in the normal practice."  U.S. Steel Comments on Draft Remand Results at 3; *see also* U.S. Steel Rebuttal Comments on Draft Remand Results at 6-7.  U.S. Steel argued that the new methodology therefore should be abandoned in calculating the final Remand Results here.  *See* U.S. Steel Comments on Draft Remand Results at 3; *see also* U.S. Steel Rebuttal Comments on Draft Remand Results at 7.

In their comments to Commerce, SeAH and KOP criticized U.S. Steel's objections to the new cost recovery analysis methodology as "results-oriented," and therefore meriting no serious consideration by Commerce.  *See* SeAH/KOP Rebuttal Comments on Draft Remand Results at 2; *see generally id*. at 2-3.  SeAH and KOP underscored that it is the statute itself that provides for a two-step analysis to determine whether to disregard home market sales.  *See id*.  As SeAH and KOP explained, 19 U.S.C. § 1677b(b)(1)(B) and 19 U.S.C. § 1677b(b)(2)(D) "clearly contemplate that [Commerce] will undertake a two-step analysis: *first* to determine whether individual sales have [been] made at below-cost prices; and, *second*, to determine whether the below-cost sales were nevertheless at prices which permit recovery of all costs within a reasonable period of time." *Id*. at 3.

SeAH and KOP acknowledged in their comments that "[i]t may perhaps be the case that, '[p]urely from the standpoint of mathematical probability,' such an analysis may sometimes result in fewer sales being disregarded than would be the case if [Commerce] only conducted the first step without conducting the second."  SeAH/KOP Rebuttal Comments on Draft Remand Results at 3.  However, as SeAH and KOP correctly pointed out, "that is the result mandated by the statute." *Id*.

In finalizing the Remand Results, Commerce reasoned that "[w]hether the [agency] is employing the standard, period-wide, cost methodology or the alternative, shorter-period, cost methodology [that was applied in this administrative review], [Commerce] must still adhere to the two statutory requirements included in [19 U.S.C. § 1677b(b)(1)]."  Remand Results at 28-29.  In the Remand Results filed with the Court, Commerce stated that, as it had in the Draft Remand Results, the agency "continued to employ the two-step analysis for disregarding sales priced below

cost as required by [19 U.S.C. § 1677b(b)(1)]." *Id.* at 29.  Commerce concluded that – as revised – the agency's alternative, shorter-period cost-recovery analysis "not only complies with the statutory mandate at [19 U.S.C. § 1677b(b)(2)(D)] to use the [period of review], weighted-average cost, but also conforms to the Statement of Administrative Action, . . . which clarifies that '[[t]he determination of cost recovery is based on an analysis of actual weighted-average prices and cost[s] during the period of investigation or review.'" *Id.* at 16 (*quoting* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 at 832 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4170; *see also* Remand Results at 30.

The change in Commerce's cost recovery analysis on remand ultimately reduced SeAH's dumping margin from 4.99% to 3.87% for this administrative review.  *See* Remand Results at 2, 31.[8]

Commerce's Remand Results on this issue are responsive to the order granting a voluntary remand, and fully consistent with the holding of SeAH I.  *See generally* Remand Results; Order (Oct. 13, 2011); SeAH I, 35 CIT at ____, 764 F. Supp. 2d at 1326-35.  Moreover, the parties have advised that no party plans to file comments on the Remand Results; and the Government urges that the Remand Results be affirmed.  *See* Joint Status Report.  Thus, like the Remand Results on zeroing, the Remand Results on SeAH's cost recovery analysis claim too must be sustained.

---

[8]As noted above, using Commerce's revised cost recovery analysis methodology, the Draft Remand Results calculated SeAH's weighted-average dumping margin to be 3.90% (down from 4.99%).  However, in its comments on the Draft Remand Results, SeAH identified a minor programming error in the draft results, which Commerce corrected in the Remand Results that were filed with the Court.  *See* SeAH/KOP Comments on Draft Remand Results at 2-3 & Att. 1; Remand Results at 30-31.  With the corrections, the Remand Results calculated SeAH's final margin to be 3.87%.  *See* Remand Results at 2, 31.

### III.  <u>Conclusion</u>

For the reasons set forth above, Commerce's Final Results of Redetermination Pursuant to Remand must be sustained in their entirety.  Judgment will enter accordingly.


<u>     /s/ Delissa A. Ridgway     </u>
Delissa A. Ridgway
Judge

Decided:  September 25, 2013
New York, New York